101 F.3d 1393
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
UNITED STATES of America, Appellee,
v.
Monica Blanca MANZANO-EXCELENTE and Miguel Ordonez, also
known as Pingo, also known as Alberto Lopez, also
known as Mauricia Fernandez, Defendants,
Luis Alberto Gutierrez-Flores, also known as Ruben and
Arturo Sanchez-Hernandez, Defendants-Appellants.
 Nos. 95-1459(L), 95-1626.
 United States Court of Appeals,
Second Circuit.
 July 25, 1996.
 
 1
 Frank Handelman, New York City, for defendant Luis Alberto Gutierrez-Flores.
 
 
 2
 James Roth, Hurwitz Stampur & Roth, New York City, for defendant Arturo Sanchez-Hernandez.
 
 
 3
 Andrea L. Labov, Assistant United States Attorney, Southern District of New York, New York City, for Appellee.
 
 
 4
 Present: WINTER, LEVAL, Circuit Judges, THOMPSON, District Judge.*
 
 
 5
 This cause came to be heard on the transcript of record from the United States District Court for the Southern District of New York and was argued.
 
 
 6
 ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the District Court is hereby affirmed.
 
 
 7
 Luis Alberto Gutierrez-Flores appeals from a conviction and sentence, following a nine-day jury trial before Judge Haight, for conspiring to distribute and possess with intent to distribute cocaine in violation of 21 U.S.C. § 846. Judge Haight sentenced Gutierrez-Flores to 151 months imprisonment followed by 5 years supervised release. Arturo Sanchez-Hernandez appeals from his conviction and sentence following a guilty plea to the same charge. He was sentenced to 210 months imprisonment followed by 5 years supervised release.
 
 
 8
 Gutierrez challenges his conviction on three grounds: (i) the failure to declare a mistrial following a witness's allegedly perjurious testimony; (ii) error in ordering eleven jurors to continue deliberating after one juror had been excused; and (iii) error in failing to conduct a post-verdict inquiry of the eleven jurors, after an alternate juror sent the court a letter stating that the excused juror may have biased the deliberations of the other jurors. All three claims are without merit.
 
 
 9
 Gutierrez argues that the allegedly perjurious testimony of Luz Betty Noguera-Bravo, a government informant, deprived him of due process of law. At trial, Noguera admitted to a prior federal conviction for participating in a different conspiracy to distribute cocaine in Florida. Gutierrez contends that Noguera perjured herself by denying various details of her prior cooperation with federal agents in connection with that conviction. Noguera explained that she gave law enforcement information about the Florida conspiracy and signed a plea agreement, resulting in an original sentence of 108 months imprisonment. The sentence was reduced to 36 months the next year. When the defense cross-examined her as to why the sentence had been reduced, Noguera gave a confused response. She testified that she did not know why her sentence was reduced, and explained that she was surprised by the original nine-year sentence, as she had understood her plea agreement to indicate a three-year sentence. She later learned through her lawyer that her sentence had been reduced. However, Noguera neither saw nor knew of any letters written from federal agents to the sentencing judge, asking for a reduced term of imprisonment. Nor did Noguera understand which legal rule allowed the reduction. She testified, "my lawyer was the one who did those things."
 
 
 10
 Letters from an Assistant United States Attorney in Miami and from a DEA agent to a federal prosecutor in Miami were produced by the government. The letters advised the sentencing court in Florida of Noguera's cooperation and were apparently the cause of the reduction of her sentence. Appellant claims Noguera's testimony was perjurious because she denied certain acts of cooperation described in these letters. Moreover, appellant argues that because the government had these letters in its possession when it called Noguera as a witness, the government was aware of Noguera's alleged perjury and thus violated its duty of candor to the court and jury.
 
 
 11
 After both parties rested, Judge Haight asked counsel whether, under United States v. Wallach, the jury should receive the letters because Noguera's testimony "may" have been perjurious in "certain aspects." 935 F.2d 445 (2d Cir.1991) (ordering a retrial where the jury was not aware of a key witness's perjury). After a series of discussions regarding what, if any, parts of the letters indicated perjury, the parties stipulated to having a portion of the DEA agent's letter read to the jury.
 
 
 12
 Despite the fact that the jury heard the relevant portion of this letter, Gutierrez argues that Noguera's testimony deprived him of due process of law. He claims that Noguera's testimony constituted perjury, and that under Napue v. Illinois, the district court should have found a mistrial because the government knew or should have known of the perjury and there is a reasonable likelihood that the false testimony affected the jury, 360 U.S. 264, 271 (1959).
 
 
 13
 Gutierrez fails to establish the threshold element of his claim: that Noguera committed perjury. To establish perjury, the appellant must show that Noguera gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993). Whether a witness made an intentional misstatement is a factual matter for the district court to determine in the first instance and for the appellate courts to review for clear error. Cf. Barr Rubber Products Co. v. Sun Rubber Co., 425 F.2d 1114, 1119 (2d Cir.1970). Because Judge Haight was never asked to make a factual finding as to whether Noguera committed perjury, our review is limited to whether Noguera committed perjury as a matter of law.
 
 
 14
 There is a paucity of evidence that Noguera was intentionally lying. Noguera testified to signing a plea agreement that she believed would give her a three-year sentence once she had agreed "to clear everything what [sic] I know." She also testified to telling federal agents about her drug-related activities in Chicago. While Noguera could not remember the specifics of her plea agreement, was confused as to the details of her prior cooperation with the DEA, and did not understand which legal rule allowed for the reduction of her sentence, confusion and inability to remember do not constitute perjury.
 
 
 15
 Gutierrez has not shown that Noguera purposefully lied. Her confused and even inaccurate answers about the details of events in her cooperation that occurred several years before do not demonstrate intentional falsity, especially in view of the fact that she, from the start, openly admitted that she gave information to the government.
 
 
 16
 Because Gutierrez has failed to demonstrate perjury, we need not consider whether the government violated its duty of candor to the court.
 
 
 17
 Gutierrez's second claim--that the district court erred in allowing eleven members of the jury to continue deliberations after one juror was excused--is also without merit. During the first day of jury deliberations, a juror informed the court that he could not deliberate in the case at hand because, as he explained:
 
 
 18
 my knowledge as a serious student of the activities of the United States Government ... prevents me from knowing participation in convicting defendants, who, however culpable, are both the logical product and the probable scapegoats of a government which taxes its citizens $13 billion annually for the stated purpose of ridding our society of illegal trafficking in narcotics at the same time that government is directly and indirectly responsible for the wholesale importation and distribution of such drugs for the express purpose of financing covert operations which constitute crimes against the people and Constitution and of the United States and, more importantly, crimes against humanity.
 
 
 19
 Judge Haight excused the juror for cause. Before he dismissed the remaining eleven jurors for the day, the judge asked the jury to consider whether the juror's dismissal affected them in any way that would cause them not to be "fair and impartial and objective." The next morning Judge Haight again asked the jurors to assess their ability to proceed without bias. If any juror felt that he could not be impartial, the juror was to raise his hand and the judge would discuss the matter with him in private. When no juror responded, Judge Haight explained that Federal Rule of Criminal Procedure 23(b) allowed the jury to continue deliberations with less than twelve members in certain circumstances. He asked the jury to proceed, but warned them to begin deliberations anew, disregarding anything that the dismissed juror may have said.
 
 
 20
 Gutierrez argues that Judge Haight abused his discretion in allowing deliberations to proceed because: (i) the trial was not lengthy or complex, thereby eliminating the need to conserve judicial resources by avoiding a mistrial; (ii) there was a high risk that the dismissed juror "poisoned" the deliberations of the remaining jurors; and (iii) Judge Haight's collective inquiry as to the jury's ability to deliberate impartially was insufficient. We disagree.
 
 
 21
 The Advisory Committee comment to the 1983 amendment to Rule 23(b), authorizing eleven member juries, points to the length of the trial as a factor to consider: "If the trial has been brief and not much would be lost by retrial, the court might well conclude that the unusual step of allowing a jury verdict by less than 12 jurors absent stipulation should not be taken." This language, however, is far from dispositive. Not only did the Committee refrain from requiring courts to consider brevity--"the court might well conclude" (emphasis added)--but the language also lacks any specific indication as to what constitutes a "brief" trial.
 
 
 22
 Gutierrez's trial, up to the removal of the twelfth juror, had lasted eight days. Judge Haight explained he would allow the jurors to proceed, because "[t]he resources of the court are severely stretched." We conclude without difficulty that Judge Haight acted within his discretion in proceeding with eleven jurors. See United States v. Gabay, 923 F.2d 1536, 1543 (11th Cir.1993); United States v. Egbuniwe, 969 F.2d 757, 763 (9th Cir.1992) (eleven member jury verdict upheld where trial lasted nine days and retrial "would have involved a substantial expenditure of tax dollars and the consumption of judicial resources").
 
 
 23
 Gutierrez's argument that Judge Haight disregarded a high risk of bias among the remaining jurors also fails. He relies principally on United States v. Hernandez, 862 F.2d 17 (2d Cir.1988), cert. denied, 489 U.S. 1032 (1989), a decision entirely distinguishable from the instant case. In Hernandez, the jury deliberated for four days; it was hung eleven to one, the dismissed juror being the sole hold-out for acquittal; upon dismissal of the juror, the district judge praised the remaining eleven jurors for their efforts to persuade the dismissed juror to vote to convict before sending them out to reconsider the verdict for a "short" period of time. Id. at 22. We held that the four days of deliberations had polarized the eleven jurors against the dismissed juror. Id. at 24. The judge's statements praised the remaining jurors for their efforts to persuade the dismissed juror to vote to convict and thus tainted further deliberations among the eleven. Id. at 23. Moreover, it was unclear whether "the removal was for mental incompetence rather than to avoid a hung jury." Id.
 
 
 24
 In contrast, the jury here deliberated only for one afternoon before the juror was dismissed. No evidence suggests that the jury had voted on the charges or had begun to discuss the substance of the evidence at this point. Unlike Hernandez, this case raises no concern over removing the sole hold-out juror in a hung jury. Nor is there any indication that one afternoon's exposure to the dismissed juror polarized the jury in any way.
 
 
 25
 Gutierrez's further argument, that Judge Haight's examination of the jurors was insufficient because he conducted it in the presence of the whole group, is equally without merit. Judge Haight instructed the jurors to raise their hands if any one of them felt they would have difficulty deliberating impartially after the juror's dismissal. He indicated that if anyone had such a problem, he would discuss it with him or her in private. Because no jurors raised their hands, no individual voir dire occurred. Judge Haight's examination easily fell within his discretion. See United States v. Ruggiero, 928 F.2d 1289, 1300 (2d Cir.), cert. denied, 493 U.S. 1087 (1991).
 
 
 26
 Gutierrez's final challenge to his conviction involves Judge Haight's decision not to conduct a post-verdict hearing to investigate jury bias, after an alternate juror sent the court a letter indicating that the dismissed juror had brought extraneous materials into the jury room during the course of trial. Once the jury had rendered a guilty verdict, an alternate juror, William Ploski, wrote the court that a male juror had brought in and read "books on drug trafficking, drug lords and violence, Cartels and cocaine" every day during trial. Judge Haight conducted an in camera examination of Ploski in which Ploski identified the juror with the books as the dismissed juror.
 
 
 27
 Ploski told Judge Haight that he, Ploski, never saw any of the other jurors pick up, open, or read any of the books themselves. Nor did he witness or have any conversations with other jurors regarding the books.
 
 
 28
 We are "always reluctant to 'haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.' " United States v. Ianniello, 866 F.2d 540, 543 (2d Cir.1989) (citing United States v. Moon, 718 F.2d 1210, 1234 (2d Cir.1983), cert. denied, 466 U.S. 971 (1984)). However, where there exists "clear, strong, substantial and incontrovertible evidence ... that a specific non-speculative impropriety has occurred," id. (citing Moon, 718 F.2d at 1234), the district court must conduct a post-trial jury hearing "with all interested parties permitted to participate," id. (citing Remmer v. United States, 347 U.S. 227, 229-30 (1954)).
 
 
 29
 As there is no indication that any of the jurors read or discussed the books, appellant's argument that the presence of the books created bias is too speculative to mandate a post-trial hearing. The in camera interview with the alternate juror satisfied the court's duty to investigate potential bias. We therefore affirm Gutierrez's conviction.
 
 
 30
 Appellant Sanchez challenges his 210 month sentence, arguing that Judge Haight misapplied the Sentencing Guidelines by: (i) incorrectly characterizing his role in the cocaine conspiracy as that of a "manager or supervisor" under U.S.S.G. § 3B1.1(b); (ii) giving him a two level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) instead of a three level reduction under U.S.S.G. § 3E1.1(b); and (iii) failing to grant him a downward departure for extraordinary family circumstances. We reject all three of Sanchez's claims.
 
 
 31
 In determining whether the district court erred in applying the Sentencing Guidelines, we accept the district court's findings of fact unless they are clearly erroneous. United States v. Davis, 967 F.2d 84, 88-89 (2d Cir.), cert. denied, 506 U.S. 928 (1992). Appellant fails to meet this standard, as the record provides sufficient evidence that he acted as a supervisor or manager: Sanchez contacted his co-defendant, Ordonez, when he learned about the availability of drugs; he participated in making arrangements for the transfer of cocaine from El Paso to New York; he personally oversaw Noguera's transport of the cocaine, directing her as to where to go on the road and where to take the drugs upon delivery in New York. Indeed, Sanchez admits that his role was "to facilitate and monitor the cross-country shipment," implying a supervisory function in overseeing Noguera's drive to New York.
 
 
 32
 Sanchez further argues that he should have received a three level downward departure for the acceptance of responsibility under § 3E1.1(b), instead of the two level departure Judge Haight granted under § 3E1.1(a). The larger reduction is available for "timely" cooperation with the government. Id.
 
 
 33
 However, Sanchez pleaded guilty only one business day before his trial was to commence. He claims that he originally proffered a willingness to cooperate to the government shortly after his arrest but later changed his mind because he wanted to protect his family in Mexico. Sanchez offers no evidence of this proffer in the face of the government's assertion that he did not provide complete information regarding his involvement. Under the circumstances, the district court was well within its discretion in giving appellant only a two level reduction.
 
 
 34
 Finally, Sanchez argues that the district court incorrectly rejected a downward departure based on extraordinary family circumstances. We may review a sentencing court's decision not to grant a downward departure only if "the guidelines were misapplied, the court misapprehended its authority or imposed an illegal sentence." United States v. Monk, 15 F.3d 25, 28 (2d Cir.1994). None of these circumstances are present here. We thus lack jurisdiction to consider this claim. United States v. Millar, 79 F.3d 338, 345 (2d Cir.1996).
 
 
 35
 We therefore affirm.
 
 
 
 *
 The Honorable Alvin W. Thompson, United States District Judge for the District of Connecticut, sitting by designation